Filed 6/7/22  In re K.R. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re K.R., A Person Coming Under Juvenile Court Law. | B312026 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 17CCJP00213B) |
| Plaintiff and Respondent, | |
| v. | |
| REYNA S. and JAMIE R., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant Reyna S.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant Jamie R.

Office of the County Counsel, Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

In November 2020, the Los Angeles County Department of Children and Family Services (DCFS) filed a petition under Welfare and Institutions Code section 300, subdivisions (b)(1) and (j) (section 300(b)(1) and section 300(j)) on behalf of five-month-old K.R., alleging he was at risk due to the unresolved substance abuse problems of both appellant-Mother Reyna S. and appellant-father Jamie R. In April 2021, the juvenile court sustained the petition and removed K.R. from both parents. On appeal, they contend the court erred in finding jurisdiction and removing K.R. from their custody because substantial evidence did not support a finding they had substance abuse problems, or that any such problems placed K.R. at risk. They also contend the court erred by failing to place K.R. with Mother in her inpatient drug treatment program.

We conclude substantial evidence supports the court's jurisdictional findings, and the decision to remove K.R. from both parents. We further conclude that the propriety of the court's decision not to place K.R. with Mother in her inpatient program is likely moot as, according to Mother, her residency at that program terminated in July 2021. In any event, we discern no error in this decision, and therefore affirm the court's orders.

## STATEMENT OF RELEVANT FACTS

### A. *Background and Prior Involvement with DCFS*

Appellants Reyna S. and Jamie R. are the mother and father of K.R. (born June 2020) and Alan (born February 2015). Mother is also the parent of Rose (born September 2009), Jesus (born August 2010), and Ariel (born September 2017); Father is also the parent of Jaime (born November 2005) and Anthony (born May 2007). This appeal concerns only K.R.

Mother's criminal history included two arrests for possession of a controlled substance. Father's criminal history included arrests for possession of controlled substance paraphernalia, two arrests for possession of narcotic controlled substances, two arrests for being under the influence of a controlled substance, an arrest for bringing a controlled substance into prison, and more than nine

arrests for possession of a controlled substance. Father is a "registered substance offender."

In 2006, the juvenile court declared Father's son Jaime a dependent of the court after sustaining a petition alleging that Father and Jaime's mother had a history of drug abuse, and made drug paraphernalia accessible to Jaime. In 2007, the juvenile court declared Father's son Anthony a dependent of the court for the same reason. The juvenile court terminated the family reunification services provided in Jaime's case, and ordered no family reunification services in Anthony's. In February 2008, the court terminated Father's parental rights to both children.

In 2016, the juvenile court declared Mother's children Rose and Jesus -- along with Mother and Father's son Alan -- dependents of the court after sustaining a petition alleging that Mother physically abused Rose and Jesus; that Mother and Father engaged in domestic violence in Rose's presence; that Mother was a current abuser of methamphetamine and cared for the children while under the influence; and that Father had a history of substance abuse. Family reunification services were terminated due to Mother's inconsistency in following court orders; the children were receiving permanent placement services. During the investigation, Rose stated she had seen both Mother and Father smoke a "white powder" using a "long object with . . . a 'cup' at the end." Rose stated Mother put this object in a drawer, and Rose had also seen it lying on top of Mother's bed. Rose once gave the object to her maternal grandmother,

and her grandmother became very upset. When a police officer showed Rose a picture of a pipe used to smoke methamphetamine, she immediately identified it as the object she had seen at her home. Rose also stated that Mother smoked "red little things" which emitted white smoke. Both Rose's brother and the children's foster parent reported that Mother informed the children they were in foster care because Rose had lied about her and Father's drug use. During this investigation, Father denied he had ever used drugs, or had ever seen Mother use drugs.

In September 2017, Mother gave birth to Ariel in her home, and then brought her to the hospital.[1] Mother was very guarded and refused to provide any information. She denied abusing substances, but refused any tests for both the baby and herself, and wanted to leave the hospital as soon as possible. Ariel was detained; the court eventually terminated Mother's rights to Ariel, and placed her with her father.

### B.  *DCFS Investigates a Referral*

In October 2020, DCFS received a referral alleging general neglect of K.R. The reporting party alleged Mother was in a drug treatment program and had tested positive for crystal methamphetamine three days earlier. The reporting party stated that Mother had explained that after she fought

---

[1]     Although Ariel was born during the period Mother and Father were together, she is not Father's child.

with Father, she left the house alone "to meet her friends to get high." Mother was "very guarded" because she was concerned DCFS would remove K.R. Before K.R. was born, Mother had told the reporting party she would rather risk birthing him at home than going to a hospital where DCFS would remove him.

The next day, a children's social worker (CSW) arrived at the address listed in the referral and discovered that the maternal grandmother (MGM) lived there, but Mother did not. However, MGM was taking care of K.R., and informed the CSW that Mother left K.R. with her every three or four days, or whenever she was attending her drug treatment program. MGM stated Mother had been drug free for "a few months" due to weekly testing at a program.

The next day, at the CSW's request, Mother agreed to drug test. However, when Mother arrived at the testing site, she informed the CSW she was unable to test because the CSW had told the site that Mother's surname was R. (Father's last name), but her California ID listed her surname as S. (her maiden name). Mother offered to stay at the site while the CSW corrected the problem, but the CSW told Mother she would need to return another day. Mother then offered to test at her drug treatment program and provide the CSW with the results. The CSW subsequently received negative test results the next day.

Eleven days later, the CSW met with Mother at MGM's home. Mother admitted that Ariel had been placed with her father, and that Rose, Jesus, and Alan were receiving

6

permanent placement services, but refused to provide any further details, claiming DCFS had removed the children without proof of abuse or neglect. She elaborated that the cases resulted from a false accusation that she used drugs, and that this accusation originated from law enforcement stopping her while she was driving and discovering needles along with her mother-in-law's medicine in her car. Mother explained that although she was unable to complete the court-ordered programs because she refused to lie and say she had a substance abuse problem, she was now attending a drug treatment program at Clinica Romero because she had no choice. She reiterated she did not have a drug problem and denied testing positive or using drugs. Mother stated she was very concerned that DCFS would detain K.R., adding that she even hid her pregnancy from her other children for fear one of them would mention it to DCFS. Mother claimed she and Father had been in a relationship for five years and had been married for two. She claimed the relationship was good and was without domestic violence. She denied Father had any substance abuse issues. Mother explained he was a tattoo artist currently working in Arizona and, once settled, Mother and K.R. would join him.

The CSW interviewed Father in late October 2020. He confirmed the length of his relationship with Mother, that they were the parents of Alan and K.R., and that he was a tattoo artist currently working in Arizona, with intentions to open his own business in Georgia. He expressed no concerns with Mother caring for K.R., claiming neither he nor Mother

drank alcohol or abused substances. Father stated he could not drug test because he was not in California and did not know when he would return. The next day, the CSW received another negative drug test result from Mother.

In November 2020, the program director at Clinica Romero informed DCFS that Mother was signing a release permitting the sharing of her information with DCFS, and she also stated that Mother had 22 negative drug tests and one positive test. The director opined Mother was "on the right track."

Two weeks later, Mother informed the CSW that the family had moved to Georgia. When the CSW stated a case had been opened for K.R. and DCFS needed to know where he was, Mother replied that she did not have their address at hand and did not understand why DCFS opened a case after she had completed her drug treatment program at Clinica Romero (Mother claimed a certificate of completion was pending). The next day, Mother texted her new address to the CSW. She also called, asking the CSW what DCFS's recommendation was for her case; the CSW stated DCFS wanted Mother to enter an inpatient program with K.R. Mother agreed to look for such a program in Georgia.

DCFS contacted the Child Protective Hotline in Georgia to explain its concerns regarding the family; the service refused to investigate but agreed to conduct a courtesy interview. The service reported back that Mother and Father were temporarily living with an aunt until they found their own place, that K.R. was dressed appropriately

and had no marks or bruises, and that the family was well stocked with baby supplies. DCFS also asked the Gwinnett Police Department to conduct a child welfare visit; the department reported the family appeared normal and in good spirits, and it had no concern regarding K.R.'s safety.

### C. *DCFS Files a Petition*

In late November 2020, DCFS filed a petition under section 300(b)(1) and section 300(j) on behalf of K.R. Counts b-1 and j-1 identically alleged that Mother had a history of substance abuse and was a current user of illicit drugs, rendering her incapable of caring for K.R.; that Father knew of Mother's substance abuse and failed to protect K.R.; and that K.R.'s siblings (Rose, Jesus, and Alan) were dependents receiving permanent placement services due to Mother's substance abuse. Counts b-2 and j-2 identically alleged that Father had a history of substance abuse rendering him incapable of caring for K.R.; that Mother knew of Father's substance abuse and failed to protect K.R.; and that K.R.'s half-siblings (Jaime and Anthony) were prior dependents of the juvenile court who received permanent placement services due to Father's substance abuse; and that Father was a registered controlled substance offender with a criminal history including convictions for drug-related offenses.

At the detention hearing, counsel for K.R., and for each parent, all asked the court not to detain K.R., contending

DCFS had not met its burden.  The court disagreed, and ordered K.R. detained.  He was transported from Georgia to California and placed in the care of the maternal aunt and uncle.


### D.    *DCFS Continues to Investigate*

The CSW again interviewed Father.  Father admitted Mother had one positive drug test but claimed the next five tests were negative.  He also stated that Mother was "on the cusp" of graduating from her drug treatment program before she had to leave for Georgia.  Father reported he was taking a domestic violence class and attending Narcotics Anonymous.[2]  He expressed his belief that DCFS failed to help his family, and that the current allegations about him were outdated.  He admitted that two of his children were removed from him due to his substance abuse, and that his rights to those children were ultimately terminated.  He also stated that he and Mother had no contact with Alan because DCFS was in the process of terminating their parental rights.  He voiced his desire for K.R. to be placed with Mother in her inpatient program.  Father agreed to drug test but stated he had no means to pay for it.  He subsequently sent the CSW negative results from several drug tests that he undertook voluntarily when he could pay for them.  He

---

[2]    Father claimed that he and Mother never engaged in domestic violence, but that he was required to take the class because of statements made by Rose.

10

also provided evidence he had taken a parenting class, was still enrolled in a domestic violence class, and was trying to get a sponsor in Narcotics Anonymous. Father claimed the last time he used an illicit substance was when he used marijuana in 2014.

Mother began a six-month inpatient drug treatment program in January 2021, and the CSW interviewed her telephonically; Mother spoke with the CSW with her counselor listening in. Contradicting her previous denial, Mother admitted to the positive drug test in October 2020 but claimed that had been the only positive test. She explained that she had been arguing with Father and, applying a lesson she learned from a domestic violence class, had asked a friend to come pick her up to remove her from the situation and avoid escalating the argument. However, this friend was the person who had introduced Mother to drugs, and after being picked up, Mother subsequently used methamphetamine. She did not return home for two days, leaving K.R. in the care of Father. Despite Father's status as a registered drug offender, Mother claimed Father did not use drugs and was unsure if he was aware she did.

In discussing the detentions of her other children, Mother claimed she had been pulled over by police who found syringes in her car -- Mother told the CSW they belonged to her mother-in-law, who was diabetic.[3] Mother

---

[3] According to the 2016 police report associated with this arrest, Mother admitted to the officer "to being a regular
*(Fn. is continued on the next page.)*

11

initially denied a history of substance abuse, but the CSW heard Mother's counselor encouraging her to be honest, and the CSW was placed on hold. When the call resumed, Mother confirmed a history of substance abuse but refused to specify which substances. She did not know when she began using and, after a while, admitted: "'I do have a problem. I am working on it.'" Mother stated she had been at her current program since early January 2021. Despite having claimed previously that she had finished her program at Clinica Romero and that a certificate of completion was pending, she now said she had been ten days away from completing it when she moved to Georgia. In her current program, she claimed to be testing both weekly and on a random basis.

The CSW spoke with another CSW who had investigated the parents in a previous case. The previous CSW indicated that Mother never worked on her substance abuse issues and continued to use drugs despite attending drug treatment programs. This CSW also noted that the parents blamed Rose and DCFS for their predicament, taking no responsibility for their own actions.

---

methamphetamine user" but, when asked why she had hypodermic needles in her car, she stated it was because her "'boyfriend . . . slams meth'" (i.e., injects it intravenously). During the DCFS investigation of this incident, Mother denied any drug use, and MGM claimed the needles were for Rose's medication.

### E. *Adjudication and Disposition*

No witnesses testified at the April 2021 adjudication hearing. Proceeding to oral argument, K.R.'s counsel asked the court to dismiss the case, arguing that DCFS had failed to meet its burden, and essentially was advocating that the parents could "never redeem themselves" due to the previously sustained cases. Counsel contended that the parents had been responsive to DCFS, that the positive drug test in October had been followed by multiple negative ones, that K.R. was situated differently from his detained siblings, and that there was no evidence either parent was ever under the influence while caring for K.R. Mother's counsel joined the argument, arguing that DCFS had failed to demonstrate a nexus between the parents' behavior and harm to K.R. Father's counsel also joined, noting that both parents were enrolled in services, that there was no evidence Father failed to protect K.R., and that the Georgia equivalent of DCFS had found no safety issues.

DCFS's counsel asked the court to sustain the petition as pled, pointing to the extensive evidence in the previous cases that the parents abused drugs, their prior and current denials that they were drug abusers despite the ample evidence to the contrary, and the fact that Mother's use of methamphetamine resulted from a simple domestic disagreement, indicating Mother lacked the necessary coping skills to address emotional issues without resorting to substance abuse. DCFS's counsel also pointed out that K.R.

13

was too young to verbalize any problems he experienced in his parents' care.

The court sustained the petition, finding a long history of substance abuse for both parents, and insufficient evidence they had fully addressed the issue. As to Mother, the court cited her repeated denials that she had a substance abuse problem, her failure to complete previously ordered programs, and the fact that she had yet to complete a drug treatment program and maintain a period of sobriety thereafter. As to Father, the court cited his status as a registered drug offender, the termination of reunification services for his other children, and the evidence that he had used methamphetamine despite his denials to the contrary.

Continuing to disposition, K.R.'s counsel asked the court to release K.R. to both parents or at least to Mother. Mother's counsel joined, additionally informing the court that Mother was in an inpatient drug treatment program that would permit K.R. to reside with her. Father's counsel joined, noting that Father was attending Narcotics Anonymous and Alcoholics Anonymous and had admitted he abused substances before 2014, thus dispelling any suggestion he was in denial of his problem.

DCFS's counsel countered that the parents were still in denial about their substance abuse issues, and that K.R. was a "very, very vulnerable child." Potentially referring to Mother's request that K.R. be released to her at her inpatient program, DCFS's counsel stated that "although the

14

mother is participating in services, the mother needs to focus on her sobriety."

The court removed K.R. from both parents, again citing their unaddressed substance issues, their minimization of the problems and their credibility issues, the fact that K.R. was a child of "tender years," and that "there are no reasonable means by which the baby's physical health can be protected without removing from the parents." However, the court found the parents were making an effort and ordered family reunification services. Both parents timely appealed.

## DISCUSSION

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Under a substantial evidence review, "'we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment.'" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.) "Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

## A. *Substantial Evidence Supported the Jurisdictional Findings*

### 1. Mother

Citing Mother's long history of substance abuse and insufficient evidence that she had fully addressed the issue, the court sustained the petition against Mother under section 300(b)(1) and section 300(j). Mother argues that substantial evidence did not support a finding that, as alleged in counts b-1 and j-1, she had a long history of substance abuse, or that there was a connection between any purported drug use and harm to K.R. We disagree.

In 2016, Mother's daughter Rose informed DCFS that she saw Mother smoke a white powder using a methamphetamine pipe. In 2017, when Mother gave birth to Ariel, she refused any tests for both herself and Ariel, and attempted to leave the hospital as soon as possible, giving rise to an inference that a lab test would have shown substance abuse. Mother herself reported that in October 2020, after arguing with Father, she asked to be picked up by the friend who introduced her to drugs, and that she later used methamphetamine. Finally -- and only after her counselor encouraged her to be honest -- Mother expressly admitted she had a "'problem'" and was "'working on it.'" Substantial evidence supported a finding that Mother had a history of substance abuse.

As for the court's conclusion that this substance abuse placed K.R. at risk, a parent may place a child at risk "by

placing or leaving drugs in a location or locations where they were available to" the child, "by neglecting [the child]'s needs in a way which might be reasonably expected to create the kind of emotional and psychological conditions in which substance abuse typically thrives," and "by exposing [the child] to her own drug use, thus impliedly approving such conduct and even encouraging him to believe that it is an appropriate or necessary means of coping with life's difficulties." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 825.) Here, Mother admitted to precipitously leaving her months-old infant for two days so she could use methamphetamine. Additionally, Mother constantly left her drug paraphernalia where Rose found it, and used drugs in front of Rose, thus normalizing their use. While there is no evidence that this had yet happened in front of K.R., "evidence of past conduct may be probative of current conditions." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.)

Moreover, Mother had yet to fully address her drug abuse problem and, with one exception, consistently denied having a drug problem. The CSW who had investigated Mother's previous case opined that Mother did not take responsibility for her actions, instead blaming her daughter or DCFS for her predicament. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) We also cannot ignore that Mother was found to have physically abused Rose and Jesus; it is not unreasonable to infer a nexus between the physical abuse and Mother's drug abuse. Additionally, Mother

17

consistently evinced a lack of forthrightness with DCFS, for example falsely claiming she had completed her Clinica Romero program, denying that she had ever tested positive for drugs, and for the most part, denying her drug abuse problem. On this record, we conclude substantial evidence supported the finding that Mother's substance abuse placed K.R. at risk.

Mother argues the court ignored evidence that she was rehabilitated and not a danger to K.R., but such an argument is essentially a request that we reweigh the evidence, which we do not do. (*In re Joaquin C., supra,* 15 Cal.App.5th at 560.) The cases Mother cites are inapposite.[4]

Mother also argues there is insufficient evidence she failed to protect K.R. from Father's substance abuse, as alleged in counts b-2 and j-2. Because we find that the court did not err in sustaining counts b-1 and j-1, we need not address this argument. (*In re Alexis E., supra,* 171 Cal.App.4th at 451 ["When a dependency petition alleges

---

[4] (*In re Drake M.* (2012) 211 Cal.App.4th 754, 767 [court erred in finding jurisdiction due to Father's use of marijuana, absent evidence Father was under the influence when caring for child -- but Mother had used meth in Rose's presence and it was reasonable to conclude she would do so in front of K.R.]; *In re Alexis E., supra,* 171 Cal.App.4th at 453 [jurisdictional finding affirmed where marijuana use was accompanied by irritability, short-temperedness, and violence]; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1004 [court erred in finding jurisdiction when child had never seen Mother's drug use, and only potential harm was from child occasionally smelling the resultant smoke].)

multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence"].) However, were we to consider the argument, we would reject it. Mother does not deny that she did not protect K.R. from Father; she argues instead that insufficient evidence supported a finding that Father's drug abuse placed K.R. at risk, and thus the court erred in finding she failed to protect K.R. from a non-existent danger. As discussed below, we find the court did not err in finding K.R. at risk from Father's drug abuse and therefore substantial evidence supported the court's decision to take jurisdiction under counts b-2 and j-2 as well.[5]

---

[5] Mother additionally argues that "[t]o meet its burden under [section 300,] subdivision (b)(1), the Department had to show neglectful conduct by mother" and contends DCFS failed in this task. Father makes the same argument. However, our Supreme Court has held that "the first clause of section 300(b)(1) authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child." (*In re R.T.* (2017) 3 Cal.5th 622, 624.)

## 2. Father

The court sustained the petition as to Father, also finding a long history of unaddressed substance abuse. The court itself cited to the substantial evidence that supported this finding: Father was a registered drug offender; his reunification services in his previous case were terminated; he was in denial regarding his drug problem; and though he claimed he hadn't used drugs since 2014, Mother stated in 2016 that he "'slams meth.'" Rose saw him smoke it as well. Father does not deny the existence of this evidence.

As for evidence supporting that this history of unaddressed substance abuse placed K.R. at risk, Father also used methamphetamine in front of Rose, which supported a finding that he would use in front of K.R. (*In re Rocco M.*, *supra*, 1 Cal.App.4th at 825.) Coupled with his denial of a drug problem and his lack of candor regarding when he last used drugs, we conclude substantial evidence supported a finding that Father's drug abuse placed K.R. at risk. Further, Father also denied Mother had a drug problem, and did nothing to protect K.R. from Mother, providing an independent basis for the jurisdictional finding. Like Mother, Father cites to evidence that might potentially support a finding that he was not a risk to K.R. As noted, this constitutes an inappropriate request that we reweigh the evidence. (*In re Joaquin C.*, *supra*, 15 Cal.App.5th at 560.)

## B. *Substantial Evidence Supported the Disposition*

The court's dispositional order was supported by the same evidence that supported its jurisdictional order. On appeal, both parents contend the court erred in failing to consider Mother's attendance at drug treatment programs and both parents' participation in "services." Again, we do not reweigh the evidence.

Father additionally argues the court erred by not placing K.R. with Mother at her inpatient drug treatment program.[6] According to Mother, the program commenced January 6, 2021, and was to last six months. Thus, even had the court erred, the issue would likely be moot, as we could not direct the court to place K.R. with Mother in a program she no longer attends. In any event, we discern no error.

There was no evidence regarding what supervision, if any, Mother's drug treatment program would have provided K.R. Indeed, there was no evidence Mother was even required to remain in the program. In short, nothing in the record compelled the juvenile court to find placing K.R. in Mother's drug treatment facility would have safeguarded him from harm.

---

[6] Mother did not raise this argument, but did join in any argument in Father's brief "to the extent it inures to her benefit."

**DISPOSITION**

The court's orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

COLLINS, J.